IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. GURRE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

MOHAMUUD GURRE, APPELLANT.

Filed November 30, 2021.    No. A-21-259.

Appeal from the District Court for Hall County: MARK J. YOUNG, Judge. Affirmed.

Mark Porto, of Wolf, McDermott, Depué, Sabott, Butz & Porto, L.L.C., for appellant.

Douglas J. Peterson, Attorney General, and Melissa R. Vincent for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Mohamuud Gurre was convicted by the Hall County District Court of human trafficking and was sentenced to 35 to 40 years' imprisonment. On appeal, Gurre claims the district court committed plain error in allowing violations of the evidentiary rules when trial counsel failed to object to such violations. Gurre also claims his trial counsel was ineffective for numerous reasons. We affirm.

## II. BACKGROUND

In June 2020, the State filed an information charging Gurre with one count of human trafficking, a Class II felony, in violation of Neb. Rev. Stat. § 28-831 (Cum. Supp. 2020); K.C. was the named victim. The information was amended in October to add an additional witness.

A bench trial was held in November 2020. Two interpreters were used during the trial. A summary of the evidence follows.

Anna Brewer is the lead investigator for the human trafficking task force at the Nebraska Attorney General's Office. She was previously employed as a special agent with the Federal Bureau of Investigation for 20 years, and spent most of her career investigating sexual exploitation and violent crimes. Brewer testified that "[t]raffickers exploit vulnerabilities and marginalize status." "For example, a vulnerability . . . could be living in poverty, being homeless, having a mental health issue, [or] having an addiction to drugs or alcohol." Trafficking victims "almost always have a relationship with their trafficker." The trafficker will "start out as being kind, manipulative, friendly, willing to help out or do favors to make the person that they're trying to traffic happy." But "then there is a turning point where the trafficker turns into a more forceful, aggressive person and it's all about power and control." And "most survivors don't ever self-identify as being a victim"; "[s]ome reasons include being embarrassed, having a trauma bond with their abductor or their trafficker, feeling guilty that they may have committed some crimes during their victimization, feelings of guilt or shame[.]" The victim will often exhibit love or loyalty to their trafficker; for example, if they thought they were in a romantic relationship with the trafficker, or if the trafficker fed them or gave them a place to live when they were homeless. Survivors are not typically able to later recollect events in a chronological, sensible order because of the trauma that they experienced.

K.C., 34 years old, testified that at the time of trial, she was "working" a substance abuse recovery program, and had been sober from methamphetamine for almost 15 months. She had previously been convicted for a crime of dishonesty. She has "complex PTSD."

K.C. has four children; she relinquished her parental rights in December 2018. K.C.'s testimony did not provide any approximate dates of when various events occurred from that point in time until August 2019. After relinquishing her parental rights, she became homeless and stayed with friends in Kearney, Nebraska. A friend who lived in Grand Island, Nebraska, brought K.C. to Grand Island. K.C. eventually met Heather Wolff who was "very nice" to K.C. and they began a friendship. K.C. visited Wolff at her apartment. Wolff lived with her boyfriend, Gurre, who was known to K.C. as "Kasaye." A "man named Yahya," his girlfriend Brittany McCoy, and "a man named Bengala" were also staying at the apartment.

K.C. returned to the apartment on another occasion with her friend, "Rasta." Gurre, Mike Jones, and another gentleman were there, and Wolff was asleep naked on the bed; when K.C. tried to wake Wolff, Wolff did not respond at first, but when she did wake up she was confused and she did not realize that she did not have any clothes on. Before Wolff was awake, Gurre was "very flirtatious" with K.C. She said he was "staring and winking" at her, while talking to one of the other men in the Somalian language, a language K.C. did not understand. K.C. began to feel "very much uncomfortable and sexually unsafe" after Rasta communicated some of the conversation to her.

After her second visit to the apartment, K.C. stayed at a "trap house," which she described as "a place where a lot of drugs come in and are dispersed," "[i]t's like a real dirty place where people just come to crash." Eventually K.C. felt the need to leave the trap house because "[t]he drug scene was getting way more violent, people were getting beat up, and there was really nowhere safe to be able to sleep." She was also concerned about having police contact at that point because at the time she had warrants out for her arrest in Buffalo County, Nebraska. K.C. went back to the apartment to see if Wolff was there.

Wolff was not at the apartment when K.C. arrived, and K.C. learned that Wolff and Gurre had broken up. K.C. started talking to McCoy. During their conversation, K.C. let McCoy know that she needed somewhere to stay. After that conversation, K.C. started staying at the apartment because she had "absolutely nowhere" else to go. K.C. and McCoy began a friendship.

While staying in the apartment, K.C. shared Gurre's room because it was the only available space; sheets separated the room from the rest of the apartment. For the first couple of hours, Gurre was "kind of . . . standoffish" and made sure that K.C. knew where she was allowed to put her things, "but then he became very flirty," "winking" at her, and going across the street to get her coffee. After a while, the cell phone that K.C. had with her stopped working because someone had removed the "SIM" card, and eventually her phone disappeared. K.C. said her things began to "merge" with Gurre's things; she began to find her clothes mixed in with his, and the contents of her bag were getting "smaller and smaller" and "beginning to end up in [his] belongings." Later she found her wallet in a pile of clothes by Gurre's bed, and her driver's license, her Social Security card, and her children's Social Security cards were missing from the wallet.

K.C. stated that on one occasion, Gurre brought men into their room while she was in there. Gurre and the men would speak in Somali while looking and pointing at her, and the men gave Gurre money and drugs.

Early on when K.C. was staying at the apartment, Gurre "kicked [her] out" saying "'you make no money here, you have nothing, you have nothing here, you do nothing for me'"; Gurre did not let her take "a single thing" with her and she walked all night long in the rain with no shoes on because she had nowhere to go. McCoy subsequently let K.C. back into the apartment. At some later date, Gurre started giving K.C. methamphetamine. Once K.C. started smoking the methamphetamine Gurre provided to her, he "never asked [her] for a penny to contribute for [anything]." K.C. noticed that the methamphetamine provided by Gurre "was different than the meth that [she] had smoked before"; "[e]verything was so different about it, and the way that I felt after smoking it was drastically different." Methamphetamine typically gave K.C. more energy and helped her concentrate, but the methamphetamine that Gurre gave her made her very tired and she would wake up confused with "zero memory of going to sleep." There were even times that she was at a different location when she woke up.

After K.C. starting having blackouts, men would come into the room she shared with Gurre more often. "Initially," Gurre "would bring them in like they were best friends and say, you talk . . . I be right back and then leave." K.C. said, "I didn't want to talk," "[i]t was strange men brought in." When asked if she ever woke up from a blackout with no clothes on, K.C. responded, "Yes, 80 percent of the time." And there was "[a]lmost always" a man, or several men, in the room with her when she woke up. She said, "[T]hey all looked at me like they knew me," but "I had no idea who they were." K.C. saw the men give money and drugs to Gurre. When asked if she ever experienced physical pain after waking up from a blackout, K.C. responded, "Yes." "Most of the time, it was my private area, my vagina. There were two or three occasions that it was both my vagina and anal. It hurt really bad[.]" She had also awakened from a blackout and had anal bleeding, and she saw a ruler with blood on it on the bed with her; several men were in the room when she woke up.

K.C. testified that Gurre also took her to men's apartments and tried to leave her there. She learned from one man that he had already paid Gurre $40--he rubbed her shoulder and told her she

was beautiful; she told him to stop and eventually "convinced" him that she was sick so that he would drive her home. That was the first time she knew "for sure" and had "concrete evidence from the man himself" that money was exchanged with Gurre; she confronted Gurre when she got home but he "didn't care." There was also an occasion in August 2019 when Gurre told her that if she went to a motel and had sex with a specific individual that she would get $40. After that incident, there was a "struggle and scuffle" with Gurre to leave the apartment. Gurre pulled her and pushed her while she was trying to leave, and he told K.C. he was on the phone with the police telling them she was trying to steal his girlfriend's stuff. Once she got past Gurre she never returned. K.C. was eventually arrested on outstanding warrants.

John Wizinsky testified and affirmed that he had previously been convicted of a crime of dishonesty. Wizinsky knew K.C. "off and on" for about 2 years. The only timeframe referenced for events described in his testimony relates to "times during 2019." He was also familiar with Gurre and had been to his apartment; Gurre lived there with Michael Jones, K.C., and two other "girls." Wizinsky had been to Gurre's apartment to sell methamphetamine. On one occasion when he was at the apartment, Wizinsky observed K.C., who was not awake, laying on the bed, "covered up to her breast line, not all of the way"; "three or four guys were there and they were talking about doing some things with her and I thought they were kidding." Gurre was also in the room. Wizinsky said the men "were talking in their language," but he saw "money exchange hands." Wizinsky "had to get out of there because there was nothing [he] could do." When asked who the money was given to, Wizinsky responded, "Gurre." On another occasion when Wizinsky was at the apartment, he observed K.C. to be "awake, but she was more delirious than awake."

Other times when Wizinsky was at the apartment, he observed men coming in and out of the apartment. And there was more than one time when Wizinsky was at the apartment and observed K.C. to not be awake or conscious. When asked if he ever witnessed other men come to the apartment to "buy" K.C. while he was there, Wizinsky responded, "I have only seen money exchange once." When asked if Gurre ever tried to sell K.C. to him, Wizinsky responded, "Once." "He asked me if I wanted some of this in trade for drugs and I said, no, no"; K.C. was in the bedroom and was not awake or conscious at the time. Gurre told Wizinsky that if he talked about Gurre buying drugs from him or offering him a woman, "'bad things could happen.'"

In addition to methamphetamine, Wizinsky had seen what he believed was fentanyl at the apartment; he saw a "pink substance" and was told by one of Gurre's friends what it was and what it was used for. Wizinsky saw the fentanyl mixed in with the methamphetamine he brought to the apartment. When asked if he received information about K.C. being drugged at the apartment, Wizinsky replied, "Yeah." Wizinsky was then asked if he received that information from Gurre, and Wizinsky responded, "Yeah, it's easier to control her." When asked what exactly Gurre told him, Wizinsky responded, "Well, there was one method that they put fentanyl in the meth and it would put them out pretty quick"; another method had "something to do with like a tear drop deal put in water or something so they could pass out."

Wizinsky did not go to the police about what he observed at the apartment because "Gurre and a couple of his friends" threatened Wizinsky's wife. According to Wizinsky, Gurre and another guy also cut Wizinsky with a knife.

Cayla Larkins is a cyber investigator with the Grand Island Police Department's criminal investigation division; she was previously a patrol officer with the department. She testified that

in early 2018, while still a patrol officer, she became involved in a human trafficking investigation. The investigation expanded to more than one residence, and included Gurre's apartment beginning in early 2019. Gurre's apartment had heavy foot traffic coming in and out, and there were various calls for service in which there was violence, drugs, and possible sex trafficking. During the course of the investigation, a Facebook account associated with Gurre was found.

In September 2019, K.C. was arrested on active Buffalo County warrants, but she was later transferred to Hall County, Nebraska. In March 2020, Investigator Larkins had her first contact with K.C., who was incarcerated in Hall County. Larkins interviewed K.C. 5 to 10 times.

Gurre was arrested in May 2020 and his phone and Facebook account were searched pursuant to a warrant. A recording of audio messages sent from Gurre's Facebook messenger account to K.C. were received into evidence without objection; some messages were not spoken in English, but in the English language messages the man asked K.C. to "give back my stuff." Investigator Larkins testified that the messages were sent in August 2019.

Gurre did not testify at trial, however, he called Wolff as his only witness. Wolff testified that Gurre had been her boyfriend for approximately one year, and that they lived in an apartment together from March or April 2019 until that November. According to Wolff, she met K.C. in the summer of 2019, K.C. had been to the apartment once or twice, but K.C. never lived in the apartment when Wolff did. During Wolff's time at the apartment she never observed any drugs, unconscious women, sexual assaults, or money changing hands. She denied that Gurre was involved in any type of prostitution. When asked if she had ever been convicted of a felony, Wolff responded, "Yes."

Following closing arguments by counsel, the district court recessed to review its notes. Back on the record following the recess, the court informed Gurre "that based upon the evidence presented, the demeanor of the witnesses while testifying, and after assessing the witnesses' credibility[,] that the State has proven beyond a reasonable doubt that [Gurre] knowingly provided or attempted to provide a person for nonconsensual sexual activity and harbored a person for nonconsensual sexual activity," and it therefore found Gurre guilty of human trafficking. Gurre was subsequently sentenced to 35 to 40 years' imprisonment; he was given credit for 287 days already served.

Gurre appeals.

## III. ASSIGNMENTS OF ERROR

Gurre assigns 12 errors that we summarize into three categories. First, Gurre claims the district court committed plain error and abused its discretion in allowing violations of the evidentiary rules when his trial counsel failed to object to the violations. Second, Gurre claims his trial counsel was ineffective in numerous ways. Third, Gurre claims the cumulative effect of all of the assigned errors deprived him of his right to due process of law and to a fair trial.

## IV. STANDARD OF REVIEW

An appellate court may find plain error on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Senteney*, 307 Neb. 702, 950 N.W.2d 585 (2020).

Generally, an appellate court will find plain error only when a miscarriage of justice would otherwise occur. See *id.*

Whether a claim of ineffective assistance of trial counsel may be determined on direct appeal is a question of law. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

## V. ANALYSIS

### 1. PLAIN ERROR

Gurre contends that the district court committed plain error and abused its discretion when it allowed the State to elicit testimony from Wizinsky that Gurre had been providing K.C. with fentanyl rather than methamphetamine so as to render K.C. unable to appreciate and resist being sexually trafficked. Gurre assigns as error that such testimony was "clearly hearsay and also lacked any modicum of foundation." Gurre also contends that the court committed plain error and abused its discretion when it allowed the State to elicit critical information from Wizinsky through leading questions. Gurre acknowledges that his trial counsel did not make the respective evidentiary objections at trial, but he contends that, with regard to the hearsay testimony, the court "had an obligation to protect the integrity and fairness of the trial and its failure to strike this testimony did grave damage in that regard." Brief for appellant at 20. Further, with regard to the State asking leading questions of Wizinksy, Gurre suggests the court should have "prohibited the State from such a brazen evidentiary violation, particularly when Wizinsky's failure to provide adequate responses to basic questions created significant doubts about the veracity of the balance of his testimony." *Id.* at 24.

As a general matter, during a trial a court is not obligated to rule sua sponte on the admissibility of testimony, and therefore without an objection it is difficult to say a court committed plain error when it allowed specific testimony. *State v. Senteney, supra*. See, also, *State v. Pointer*, 224 Neb. 892, 894, 402 N.W.2d 268, 270 (1987) ("[w]ithout an objection by defendant at trial, the trial court has no obligation to interject itself into the proceedings to make rulings not requested. Such actions might well trample on defendant's trial tactics not known to the court"). An appellate court is not inclined to readily find plain error in testimony to which the opposing party did not object. See *State v. Senteney, supra.*

We do not find that the allowed testimony constitutes a miscarriage of justice or that leaving it uncorrected would result in damage to the integrity, reputation, and fairness of the judicial process. We address each of these evidentiary matters in more detail in the ineffective assistance claims discussed below. We additionally note that this case was tried before the bench, not a jury. In a bench trial there is a presumption that the trial court, sitting as the fact finder, disregards inadmissible evidence. See *State v. Thompson*, 278 Neb. 320, 770 N.W.2d 598 (2009). In a case tried to a court without a jury, there is a presumption that the trial court, in reaching its decision, considered only evidence that is competent and relevant. *State v. Smith*, 269 Neb. 773, 696 N.W.2d 871 (2005). In this case, the district court would have been aware of any shortcomings in Wizinsky's testimony and could have considered such when evaluating his credibility.

## 2. INEFFECTIVE ASSISTANCE OF COUNSEL

Gurre has different counsel on direct appeal. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. *State v. Blaha, supra.*

To prevail on a claim of ineffective assistance of counsel, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Anderson*, 305 Neb. 978, 943 N.W.2d 690 (2020). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide deficient performance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.* The record on direct appeal is sufficient to review a claim of ineffective assistance of trial counsel if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id.*

To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Gurre makes multiple assertions regarding the ineffective assistance of his trial counsel. We address each of them in turn.

### (a) Failure to Make Hearsay and Foundation Objections

Gurre claims he was denied the effective assistance of counsel when trial counsel failed to make hearsay and foundation objections to Wizinsky's testimony that Gurre had been providing K.C. with fentanyl rather than methamphetamine so as to render K.C. unable to appreciate and resist being sexually trafficked.

Gurre argues that "[t]he central theory of the State's case at trial was that Gurre systemically [sic] drugged K.C. in some manner that rendered her unconscious and suspectable [sic] for Gurre to then sexually traffic K.C. to his 'customers,'" however, the State "provided no evidence in the form of laboratory results, urinalysis testing, or any other objective test that would have helped explain what it was that Gurre purportedly used to drug K.C. in such a significant way." Brief for appellant at 16. The State relied on Wizinsky's testimony to explain how Gurre was drugging K.C. Gurre argues that Wizinsky's testimony that "'one of Gurre's friends'" told him that K.C. was being given fentanyl was inadmissible hearsay and violated Gurre's right to confrontation. *Id.* at 18. Additionally, "the notion that the 'pink substance' Wizinsky claims to have seen was, in fact, fentanyl lacked the foundation necessary for admissibility." *Id.* Gurre claims trial counsel's failure to make the relevant hearsay and foundation objections was prejudicial because Wizinsky's testimony "tied-up a critical missing piece of the State's case." *Id.* at 19.

Despite his claim to the contrary, Gurre cannot show he was prejudiced by trial counsel's failure to make hearsay and foundation objections to Wizinsky's testimony described above because Gurre made the same statements to Wizinsky, telling him that K.C. was being given

fentanyl in order to control her. At trial, when asked if he received information about K.C. being drugged at the apartment, Wizinsky replied, "Yeah." Wizinsky was then asked if he received that information form Gurre, and Wizinsky responded, "Yeah, it's easier to control her." When asked what exactly Gurre told him, Wizinsky responded, "Well, there was one method that they put fentanyl in the meth and it would put them out pretty quick"; another method had "something to do with like a tear drop deal put in water or something so they could pass out." As noted by the State, "unlike the friend's statement, Gurre's statement was neither hearsay nor subject to the Confrontation Clause." Brief for appellee at 14. See Neb. Rev. Stat. § 27-801(4)(b)(i) (Cum. Supp. 2020) (statement not hearsay if statement is offered against party and is his or her own statement). See, also, *United States v. Carr*, 607 Fed. Appx. 869 (11th Cir. 2015) (defendant's own statements do not implicate Confrontation Clause). Because Gurre cannot show prejudice, this claim fails.

(b) Failure to Object to Leading Questions

Gurre claims he was denied the effective assistance of counsel when trial counsel failed to object to leading questions by the State regarding a critical issue: key witness Wizinsky's ability to recall the identities of individuals living at the residence. The specific lines of questioning that form the basis of Gurre's claim are as follows.

At trial, the following occurred during the State's direct examination of Wizinsky.

Q Are you also familiar with an individual by the name of Mohamuud Gurre?
A Yes, ma'am.
Q Have you known Mr. Gurre by another name?
A Yeah, I know him. Just right now, my mind is --
Q Have you ever heard Mr. Gurre referred to as Kasaye?
A Yes, ma'am.

The State also asked Wizinsky about the other residents of the apartment.

Q You mentioned that Mr. Gurre lived at that residence with some other individuals; is that correct?
A Yes, ma'am.
Q Who else lived at that residence that you are aware of?
A I really didn't know all of their names because I stopped going by there a while back because of the activities that were going on there.
Q Do you remember the names of any of the people that were living there?
A Jones. They called him Michael Jones. [K.C.] I can't remember the other girls' name[s]. There was like, I believe, two others. Every time that I was there, they were usually there.
Q Are you familiar with a woman by the name of Brittany McCoy?
A Yes, ma'am.
Q Do you know if Brittany ever lived at the residence . . .?
A Yes, ma'am.
Q Do you know of a woman by the name of Heather Wolff?
A Yes, ma'am.
Q Did you ever see Ms. Wolff at [the residence]?

A Yes, ma'am.

Gurre claims that "Wizinsky's inability to recall the most basic questions about the people residing at the residence . . . creates grave questions about the reliability of his testimony." Brief for appellant at 23. "Trial counsel should have immediately recognized Wizinsky's inability to recall these basic details and registered an objection to the State's attempt to 'fix' the problem by effectively telling Wizinsky the answers." *Id.* at 24.

Gurre cannot show he was prejudiced by trial counsel's failure to make objections to the State's leading questions. It is undisputed that Wizinsky knew Gurre. Wizinsky also knew that "two other girls" lived at the residence, although he did not recall their names. As noted by the State, "The fact that Wizinsky could not independently recall their names was immaterial since there was no evidence that he associated with either girl or that they were present during the incidents that he described." Brief for appellee at 13. Furthermore, the district court was aware of the alleged shortcomings in Wizinsky's testimony and could have considered such when evaluating his credibility. Because Gurre cannot show prejudice, this claim fails.

(c) Failure to Adequately Cross-Examine K.C.

Gurre claims he was denied the effective assistance of counsel when trial counsel failed to adequately cross-examine K.C. regarding (1) a motive to avoid incarceration, (2) any benefit she may have received, or expected to receive in exchange for her testimony against Gurre, and (3) Facebook messages.

*(i) Motive to Avoid Incarceration*

Gurre claims that throughout the entire period in which K.C. indicated she was being drugged and sold for sex, there was an outstanding warrant for her arrest and she "could have sought refuge simply by turning herself in on the warrant"; "her decision not to do so clearly undermines the notion that she was a victim of truly heinous and unspeakable acts." Brief for appellant at 25. Gurre acknowledges that trial counsel did cross-examine K.C. about her decision not to leave the residence, but claims the cross-examination "failed to show how serious the charges that were subject to the warrant were and just how desperate K.C. was to avoid being incarcerated." *Id*. "Combined, the serious charges [smuggling methamphetamine into jail for an acquaintance], and K.C.'s desperation to avoid being incarcerated, would have produced significant skepticism of what was clearly an extraordinary story." *Id*.

The nature of K.C.'s outstanding warrant is not set forth in our record. Regardless, the fact that K.C. chose not to turn herself in on an outstanding warrant in no way suggests that she was not being victimized by Gurre. As to K.C.'s credibility, the district court was aware that K.C. had outstanding warrants and did not turn herself in on those warrants during the time she was staying at Gurre's apartment. Additionally, the court was aware that K.C. had been convicted of a felony or crime of dishonesty. Because Gurre cannot show prejudice, this claim fails.

*(ii) Benefit in Exchange for Testimony*

Gurre claims that trial counsel failed to cross-examine K.C. regarding any benefit she may have received, or expected to receive in exchange for her testimony against him. He argues that

"even if there was no explicit agreement to reduce the charges against K.C. in exchange for her testimony against [him], it is nevertheless entirely possible that K.C. expected that being characterized as a sympathetic victim of a heinous sexual crime would serve as a significant mitigating factor"; he contends this is "particularly true given that contact with K.C. was initiated by law enforcement while K.C. was incarcerated as part of an ongoing human trafficking investigation." Brief for appellant at 27 (emphasis in original). Gurre asserts that "after the revelations against [him] came to light," K.C. entered into a plea agreement in which her original charge for distributing methamphetamine into the Buffalo County jail, a Class II felony punishable by 1 to 50 years' imprisonment, was reduced to a Class III felony punishable by up to 4 years' imprisonment, and that she received a term of probation for the offense. *Id.*

The State claims that K.C. was convicted and sentenced in the Buffalo County case more than 2 months before Gurre was charged, and that had K.C. received some benefit in exchange for her testimony in Gurre's case, the State would have been obligated to disclose it to Gurre prior to trial. Thus, the "fact that Gurre can only speculate as to whether K.C. received a benefit for her testimony suggests that she did not[.]" Brief for appellee at 16.

The record before us does not establish the nature of the charges against K.C. in Buffalo County, or the timing of any conviction and sentence stemming from such charges. Accordingly, the record on direct appeal is insufficient to review Gurre's claim that trial counsel was ineffective for failing to cross-examine K.C. regarding any benefit she received, or expected to receive in exchange for her testimony against Gurre.

*(iii) Facebook Messages*

Gurre claims that trial counsel failed to cross-examine K.C. regarding Facebook messages which "provided no indication that Gurre had even a modicum of control or influence over K.C." and in which "the only threat that was made . . . was when Gurre threatened to call the police should K.C. fail to return what Gurre claims K.C. stole from him." Brief for appellant at 28. "In sum, the Facebook messages were inconsistent with the theory posited by the State that Gurre had absolute control over K.C." *Id.*

K.C. testified that right before she was able to leave Gurre's residence for the last time, there was a "struggle and scuffle" with Gurre. She said Gurre pulled her and pushed her while she was trying to leave, and he told her that he was on the phone with the police telling them K.C. was trying to steal his girlfriend's stuff. In the audio Facebook messages received into evidence, Gurre is asking K.C. for his stuff back. The content of the messages are not inconsistent with K.C.'s testimony, and Gurre has not explained what else trial counsel should have asked K.C. about the Facebook messages on cross-examination. Gurre has not shown that trial counsel was deficient and therefore this claim fails.

(d) Failure to Adequately Cross-Examine Wizinsky

Gurre claims he was denied the effective assistance of counsel when trial counsel failed to adequately cross-examine Wizinsky about (1) the fact that he did not report his involvement until after having received Gurre's discovery while they were incarcerated together in the Hall County jail, and (2) any potential leniency, express, implied, or even imagined, he would receive for pending criminal charges in exchange for his testimony against Gurre.

- 10 -

### (i) Reported Involvement After Receiving Discovery

Gurre argues that trial counsel failed to cross-examine Wizinsky about the fact that he did not alert law enforcement to his supposed knowledge of the case until after he received a copy of Gurre's discovery materials from Gurre while they were incarcerated together. "Had trial counsel done so, Wizinsky's credibility would have significantly deteriorated[.]" Brief for appellant at 32. As noted by the State, "whether Gurre's counsel was privy to that information or why he chose not to question Wizinsky about it cannot be determined on the record before this court." Brief for appellee at 16. Accordingly, the record on direct appeal is insufficient to review this claim.

### (ii) Benefit in Exchange for Testimony

Gurre claims that trial counsel failed to cross-examine Wizinsky regarding any potential leniency--express, implied, or even imagined--he would receive for pending criminal charges in exchange for his testimony against Gurre. According to Gurre, in March 2020, Wizinsky was charged with distribution of methamphetamine, a Class IC felony carrying a mandatory minimum of 5 years, and up to a maximum of 50 years' imprisonment. But in September, 2 months prior to his testimony against Gurre, Wizinsky entered into a plea agreement wherein he pled to possession of methamphetamine, a Class IV felony carrying a presumption of probation and a maximum of 2 years' imprisonment. Additionally, at the time of Wizinsky's testimony at trial, Wizinsky had been federally indicted and was in the process of attempting to negotiate a plea agreement in that case. Gurre claims that trial counsel should have subjected Wizinsky to "vigorous cross-examination as to exactly why Wizinsky felt comfortable incriminating himself on very serious drug charges in the course of testifying in this case," and "a more thorough cross-examination would have elicited evidence that Wizinsky either received a benefit in exchange for his testimony or at the very least, believed that he would," thus raising "grave questions about Wizinsky's credibility." Brief for appellant at 34.

The State refers us to its argument regarding the cross-examination of K.C. about any benefit she may have received for her testimony, stating that its argument also applies to the cross-examination of Wizinsky.

The record before us does not establish the nature of the charges against Wizinsky, or the timing of any conviction and sentence stemming from such charges. Accordingly, the record on direct appeal is insufficient to review Gurre's claim that trial counsel was ineffective for failing to cross-examine Wizinsky regarding any benefit he received, or expected to receive in exchange for his testimony against Gurre.

### (e) Failure to Adequately Cross-Examine Sayid Ali Hassan Mohamed

Mohamed testified that he drove K.C. to the motel so that she could take $40 from a man, and that at the motel the man tried to keep K.C. from leaving. (In her testimony, K.C. said Gurre told her that if she went to a motel and had sex with a specific individual that she would get $40). Mohamed's testimony also went to the fact that Gurre sold "girls."

Gurre claims he was denied the effective assistance of counsel when trial counsel failed to subject Mohamed to any cross-examination. He claims trial counsel should have clarified aspects of Mohamed's testimony and "should certainly have questioned Mohamed about the fact that he and Gurre have a long history of animosity stemming from their associations with warring tribes

in their home country of Somalia" to establish Mohamed's "clear bias against Gurre." Brief for appellant at 35.

Gurre has not specifically argued what "aspects" of Mohamed's testimony should have been clarified. An appellate counsel must assign and argue deficiency with enough particularity (1) for an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) for a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). Because this claim against trial counsel was not argued with sufficient particularity, it cannot be addressed in this direct appeal, and it has not been preserved for postconviction purposes.

As to his claim that trial counsel should have questioned Mohamed about the history of animosity with Gurre, whether counsel was privy to that history or why he chose not to question Mohamed about it cannot be determined on the record before us. Accordingly, the record on direct appeal is insufficient to review Gurre's claim.

### (f) Failure to Adequately Investigate State's Allegations

Gurre claims he was denied the effective assistance of counsel when trial counsel failed to adequately conduct an investigation into the State's allegations because counsel failed to (1) investigate in an attempt to develop favorable evidence, and (2) conduct depositions.

### *(i) Failure to Investigate*

Gurre argues that "those known to have been present at the residence should at the very least have been contacted and interviewed by defense representatives as part of an investigation." Brief for appellant at 36. The only persons specifically identified by Gurre are McCoy and "Bengala" who "[p]resumably . . . have seen evidence that K.C. was regularly being drugged and sold to individuals for sexual intercourse" but were not called by the State. *Id*. Thus, "[i]t stands to reason that perhaps McCoy and 'Bengala' would have provided testimony that contradicted the version of events forwarded by K.C. and trial counsel for Gurre should have undertook [sic] substantial efforts to obtain information from those obvious eyewitnesses." *Id*. Other than as to McCoy and Bengala, this allegation does not meet the specificity requirement of *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019), because Gurre did not specifically identify what other witnesses were not contacted and interviewed. The record before us does not establish whether trial counsel contacted or interviewed McCoy and Bengala. Accordingly, the record on direct appeal is insufficient to review Gurre's claim that trial counsel was ineffective for failing to investigate regarding those two individuals.

Gurre also argued that trial counsel "should have attempted to gain statements from neighbors, co-workers, and anyone else familiar with the innerworkings of the residence," and counsel should have spoken with "other customers" of Wizinsky to see if Wizinsky expressed any concerns about what was occurring at the residence. Brief for appellant at 37. This allegation does not meet the specificity requirement of *State v. Mrza, supra*, because Gurre did not specifically identify the other individuals he claims counsel should have contacted.

*(ii) Failure to Conduct Depositions*

Gurre claims he was denied the effective assistance of counsel when trial counsel failed to conduct depositions of key witnesses--K.C., Wizinsky, and Mohamed--which would have allowed counsel to explore all of the possible motives those witnesses would have had to fabricate or embellish the actions of Gurre. Whether trial counsel deposed those witnesses, or why he chose not to, cannot be determined on our record. Accordingly, the record on direct appeal is insufficient to review Gurre's claim that trial counsel was ineffective for failing to depose those individuals.

(g) Failure to Call McCoy as Witness

Gurre claims he was denied the effective assistance of counsel when trial counsel failed to call McCoy as a witness despite both K.C. and Wizinsky identifying her as an eyewitness. He claims the only question was which version of events McCoy's testimony would support. Gurre contends he "pleaded for trial counsel to call McCoy as a defense witness," and that she would have testified that K.C. was rarely, if ever, at the residence and that she did not observe any instances of women being bought and sold during a state of unconsciousness, or any form of sexual assault. Brief for appellant at 40. Trial counsel did list McCoy on the defense's witness list. Why counsel ultimately chose not to call McCoy as a witness cannot be determined on the record before us. Accordingly, the record on direct appeal is insufficient to review Gurre's claim that trial counsel was ineffective for failing to call McCoy as a witness.

(h) Advised Gurre Not to Testify

Gurre claims he was denied the effective assistance of counsel when trial counsel advised him he should not testify in his own behalf. Gurre "recognizes that he was properly advised of his unequivocal right to testify and indicated on the record that he was waiving that right." Brief for appellant at 41. However, he claims that "prior to [his] waiver of this right, he and trial counsel consulted about whether [he] should testify, with Gurre adamant that he should and trial counsel advising against the idea." *Id.* Gurre "ultimately chose to rely on trial counsel's greater knowledge and experience in trial strategy and elected not to testify. *Id.* He argues that had he testified, he would have said he "was only vaguely acquainted with K.C.," *id.*, that she never resided at the residence, and on the only occasion he definitely recalled K.C. being at the residence, she stole money and drugs from him; thus, he could have provided testimony "that would have supported an entirely different version of events than what was presented at trial," *id.* at 42. The reason counsel advised Gurre not to testify in his own behalf cannot be determined on the record before us. Accordingly, the record on direct appeal is insufficient to review Gurre's claim that trial counsel was ineffective for advising him not to testify.

(i) Failure to Develop Coherent Trial Strategy

Gurre claims he was denied the effective assistance of counsel when trial counsel failed to develop a coherent trial strategy designed to focus on the defense. He claims that in opening statements, trial counsel stated that Gurre "'did not know K.C. and did not traffic her,'" and that the "'testimony would show they only met a couple times.'" Brief for appellant at 42. Trial counsel called Wolff, whose testimony was consistent with the opening statements. Further the Facebook messages received into evidence "lack any sort of communication or references one would expect

had [Gurre and K.C.] truly been familiar with one another." *Id.* However, "trial counsel nevertheless abandoned that theory [from opening statements] at closing and argued that, 'this case comes down to consent and who is responsible,'" essentially conceding that K.C. had been drugged and had engaged in sexual activities in exchange for drugs and housing. *Id.* at 44.

Trial counsel's opening statement was as follows:

> The State is going to put on all kinds of evidence, but our theory in this case is very simple. Mr. Gurre did not personally know [K.C.], and he certainly never trafficked her. There will be testimony that he only met her a couple of times. There will be testimony to support this as well as evidence that there were multiple other parties involved who may have been responsible for whatever happened to [K.C.], if something did indeed happen to her. There will be evidence that [K.C.] willingly stayed at the house . . . and consented to the activities there. Our position is that whatever happened to [K.C.] was consensual and outside of the knowledge and control of Mr. Gurre.

Trial counsel's closing statement was as follows:

> Your Honor, this case comes down to consent and who is responsible.
>
> Multiple men were at the house . . . . It remains unknown why [K.C.] would experience blackouts and what exactly did happen to her during said blackouts. It is unknown what exact drug would have been administered as well as when exactly a drug was administered or who exactly did administer it. We believe this creates a reasonable doubt as to who is responsible for [K.C.'s] blackouts, if anyone.
>
> Furthermore, we believe it has been shown that [K.C.] was aware of her situation and participated in it. We believe that if someone is aware of their situation, participates in it, and does nothing to change it, they are therefore consenting to it.
>
> We believe [K.C.] received the benefit of narcotics, housing, and a place to evade a warrant during her time at [the residence]. This further leads us to believe she was consenting in exchange for these benefits.
>
> Lastly, Your Honor, [K.C.] and Mr. Wizinsky were both impeached. As such, Your Honor, we believe that the State has failed to meet their burden of proving Mr. Gurre is guilty beyond a reasonable doubt. We would ask that this Court find him not guilty.

Contrary to Gurre's argument, we do not find trial counsel's opening and closing statements to be incongruous. Trial counsel maintained that there was reasonable doubt as to Gurre's guilt, and thus the State could not meet its burden of proof. Counsel noted the multiple other persons who may have been responsible for what happened to K.C., if anything did happen to her, and counsel also posited that K.C. consented to whatever did happen.

Gurre also argues that it was incumbent upon trial counsel "to develop some theory for the factfinder as to why K.C. would concoct" the allegations, and Gurre suggests that the theory should have been that she was trying to avoid arrest on her outstanding warrants. Brief for appellant at 43 (emphasis in original). Gurre asserts that the "[Facebook] messages," a method of communication "consistent with the notion that [they] . . . were barely acquainted with one another," "along with K.C.'s complete reluctance to simply turn herself in on outstanding warrants or otherwise remove herself from the situation, and subsequent efforts to get out of jail once she was ultimately arrested

on the warrants," would have made for a "compelling explanation" as to why she would "make up such dramatic allegations." *Id.* at 43-44. However, as stated previously, neither the Facebook messages nor K.C.'s failure to turn herself in on the warrants means that she was not trafficked. Furthermore, it is the State's burden to prove Gurre's guilt beyond a reasonable doubt, it is not Gurre's burden to prove anything. Because Gurre has not shown that his counsel was deficient in developing a coherent trial strategy, this claim of ineffective assistance of counsel fails.

### 3. Cumulative Effect of Errors

Gurre claims that the cumulative effect of all of the assigned errors deprived him of his right to due process of law and to a fair trial. While any one of several errors may not, in and of itself, constitute prejudicial error warranting a reversal, if all of the errors in the aggregate establish that the defendant did not receive a fair trial, a new trial must be granted. *State v. McSwine*, 24 Neb. App. 453, 890 N.W.2d 518 (2017). The question, then, is whether in the aggregate the claimed errors denied Gurre a fair trial. See *id.*

We found no merit to any of Gurre's assigned errors. We found no plain error in the district court's allowance of testimony when Gurre's trial counsel did not make evidentiary objections. We concluded that many of Gurre's ineffective assistance of counsel claims either failed or were not alleged with sufficient particularity. We were unable, on direct appeal, to resolve Gurre's remaining claims of ineffective assistance of trial counsel, and thus, those unresolved claims cannot form the basis for a claim of cumulative error. Accordingly, Gurre's cumulative error argument fails.

### VI. CONCLUSION

For the reasons stated above, we find no plain error in the district court's allowance of testimony when Gurre's trial counsel did not make evidentiary objections.

We also find that the following claims by Gurre that his trial counsel was ineffective either fail or were not alleged with sufficient particularity: failing to make hearsay and foundation objections to Wizinsky's testimony; failing to object to leading questions by the State during Wizinsky's testimony; failing to adequately cross-examine K.C. regarding a motive to avoid incarceration and regarding Facebook messages; failing to clarify aspects of Mohamed's testimony; failing to contact and interview other witnesses, besides McCoy and Bengala; and failing to develop a coherent trial strategy.

The record on direct appeal is insufficient to address Gurre's remaining ineffective assistance of trial counsel claims related to: failing to question K.C. and Wizinsky about benefits received in exchange for testimony; failing to question Wizinsky about not alerting law enforcement about his knowledge of the case until after seeing discovery obtained by Gurre when Wizinsky and Gurre were incarcerated together; failing to question Mohamed about his history of animosity towards Gurre; failing to investigate with regard to McCoy and Bengala; failing to depose K.C., Wizinsky, and Mohamed; failing to call McCoy as a witness; and persuading Gurre to not testify.

We further find that Gurre's cumulative error argument fails. Accordingly, we affirm Gurre's conviction and sentence.

AFFIRMED.